UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BRENDAN REGINBALD, Derivatively on Behalf of ATI PHYSICAL THERAPY, INC., | No. 1:23-cv-5111 |
| Plaintiff, | |
| v. | **PUBLIC REDACTED VERSION** |
| FORTRESS ACQUISITION SPONSOR II LLC, FORTRESS INVESTMENT GROUP LLC, LABEED S. DIAB, JOSEPH JORDAN, JOHN L. LARSEN, JOHN MALDONADO, CARMINE PETRONE, JOANNE M. BURNS, JAMES E. PARISI, ANDREW A. MCKNIGHT, JOSHUA A. PACK, MARC FURSTEIN, LESLEE COWEN, AARON F. HOOD, CARMEN A. POLICY, RAKEFET RUSSAK-AMINOACH, and SUNIL GULATI, | |
| Defendants, | |
| -and- | |
| ATI PHYSICAL THERAPY, INC., a Delaware Corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint. Plaintiff's allegations are based upon his personal knowledge, as to himself and his own acts, and upon information and belief developed from the investigation and analysis by plaintiff's counsel, including without limitation: (i) review and analysis of public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of filings in federal court, including pleadings in the related securities fraud class action, captioned *Burbige, et al. v. ATI Physical Therapy, Inc., f/k/a Fortress Value Acquisition Corp. II, et al.*, No. 1:21-cv-04349 (the "Securities Class Action"), pending in this District; (iii) review and analysis of press releases, news reports,

analyst reports, industry reports, investor conference call transcripts and slides, and other information available in the public domain; and (iv) a review of nominal defendant ATI Physical Therapy, Inc.'s ("ATI" or the "Company") f/k/a Fortress Value Acquisition Corp. II ("FVACII") internal books and records produced in response to plaintiff's inspection demand pursuant to title 8, section 220 of the Delaware General Corporation Law Code ("Section 220").

### NATURE AND SUMMARY OF THE ACTION

1.       This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant ATI f/k/a FVACII against certain members of its Board of Directors (the "Board") and certain of the Company's executive officers seeking to remedy defendants' breaches of fiduciary duty, violations of the Securities Exchange Act of 1934 (the "Exchange Act"), and unjust enrichment.

2.       Recognizing Delaware's repeated admonitions that stockholders investigate wrongdoing before pursuing a derivative action, plaintiff sent his Section 220 demand to the Company.   After substantial negotiations and document productions, including demanding documents be reproduced without redactions, ATI finally completed its production in August 2022.  It was only after reviewing these documents that plaintiff was able to learn about and plead defendants' breaches of fiduciary duty, violations of securities law, unjust enrichment, and other wrongdoing.

3.       Defendant Fortress Investment Group LLC ("Fortress") formed FVACII as a special purpose acquisition company ("SPAC").  SPACs are essentially blank-check companies that typically go public with no operations of their own.  Instead, the purpose of a SPAC is to raise money and then acquire a separate company with operations.  Usually, a SPAC has a "sponsor" with an established track record that is entrusted by investors to faithfully exercise fiduciary

obligations, including those related to finding an undervalued combination target company that would benefit from the SPAC's financial resources and access to the public markets. While SPACs that run honestly and for the benefit of stockholders can create value, inherent conflicts in their structure, including, among other things, a limited time period within which the sponsor must consummate a business combination and lucrative financial incentives for doing so, can undermine a SPAC's utility and harm the Company and its independent stockholders.

4.      Unfortunately, here, the Company was stuck with the latter situation. Defendants pushed through the acquisition of Wilco Holding, Inc. ("Legacy ATI") by FVACII (the "Merger"), which arose from a flawed and unfair process, including severe disclosure defects, which resulted in stockholders largely voting to approve a grossly mispriced transaction. Defendants did so because, through the Merger, even as poorly priced as it was, they had the potential to net themselves tens of millions of dollars in benefits. In stark contrast, this potential massive windfall would cease to exist if a business combination was not consummated within the limited time period.

5.      In particular, before FVACII went public, defendants received 8.625 million "Founder Shares" for an aggregate contribution of $25,000 (less than $0.003 a share). In August 2020, defendant Fortress Acquisition Sponsor II LLC (the "Sponsor") transferred 25,000 shares to each of the non-Fortress affiliated directors, defendants Aaron F. Hood ("Hood"), Carmen A. Policy ("Policy"), Rakefet Russak-Aminoach ("Russak-Aminoach"), and Sunil Gulati ("Gulati"), for the same less than $0.003 a share price the Sponsor paid. FVACII went public on August 14, 2020, selling 34.5 million units at $10 per unit, raising proceeds of $345 million at its initial public offering (the "IPO"). Each unit consisted of one share of Class A common stock and one-fifth of one warrant, with each warrant enabling the holder thereof to purchase one share of Class A

common stock at a price of $11.50 per share. Even after the IPO, the holders of the Founder Shares (i.e., the defendants) retained the right to elect all of the Company's directors until a business combination was consummated.

6. The amount defendants raised was, for the most part, placed in a trust account so that FVACII could effectuate a business combination. If FVACII entered into a business combination within twenty-four months of the IPO, the defendants' Founder Shares would convert into Class A common stock. The conversion ratio was such that the Founder Shares would equal, in aggregate, 20% of the total number of all shares of common stock outstanding following the business combination. However, if defendants did not complete an initial business combination within twenty-four months of the IPO, FVACII would need to redeem 100% of the public shares at a per share price equal to the aggregate amount deposited in the trust account, including interest, subject to certain expenses, and the Founder Shares would effectively expire as worthless.

7. In addition, the Sponsor's parent faced significant reputational risk if it did not close a business combination. Fortress indirectly owns all of the outstanding equity in the Sponsor. FVACII was the second of at least six SPACs that Fortress created. The first "Fortress Value Acquisition Corp." completed its IPO and business combination in November 2020. Fortress has two additional Fortress Value Acquisition Corp. SPACs that have completed their IPOs, but have not had a business combination, and two more that have yet to go public. Failure to complete a business combination would create a significant drag on these four additional SPACs and the hundreds of millions of dollars Fortress could reap from them. Accordingly, defendants had substantial interests in ensuring that a business combination was consummated and thus stood on both sides of the transaction. As a result, they have the burden of showing the entire fairness of the Merger, a burden they will not be able to meet.

8.     ATI is a national healthcare company that specializes in outpatient rehabilitation and adjacent healthcare services.  The Company has 900 clinics operating in twenty-four states. Legacy ATI's biggest out of pocket expense to run these clinics was salaries and related costs. According to the Definitive Proxy Statement on Form DEFM14A, filed with the SEC on May 14, 2021, soliciting stockholder votes in favor of the Merger (the "Proxy"), salaries and related costs accounted for over $306 million out of the total $489 million in total clinic operating costs.  Thus, the Company's ability to attract and retain sufficient physical therapists and clinicians to serve patient demand was and is the most important issue facing Legacy ATI and ATI.

9.     ████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████

10.     Defendants knew that if a large amount of FVACII Class A stockholders chose to redeem their stock such that a threshold $5,000,001 net tangible asset value was not maintained by FVACII, or a minimum $472.5 million available cash condition requirement was not satisfied by FVACII and/or not waived by the parties to the Merger, the business combination would not be consummated.  Thus, defendants were also heavily incentivized to present a business combination in a way to convince stockholders to not redeem.  Accordingly, it is no surprise that they did not disclose the negative information about Legacy ATI's labor issues to the Class A stockholders before the June 11, 2021 redemption deadline.

11.     Rather, defendants embraced their unique incentives here to reap a massive windfall not shared by the Company's ordinary outside stockholders.  In the Merger, the FVACII Board breached its fiduciary duty by knowingly and consciously failing to perform proper due

diligence about Legacy ATI's business prospects or disloyally ignoring such facts to benefit themselves to the detriment of FVACII's minority stockholders.  Further, these defendants issued the false and misleading Proxy, which prevented the Class A stockholders from making an informed decision on whether to redeem their stock and how to vote on the Merger.  The Legacy ATI Defendants (as defined below) aided and abetted these breaches of fiduciary duties.

12.     Relying on the adequacy of the disclosures in the Proxy, a vast majority of the Company's outside stockholders voted in favor of the Merger.  The Merger closed on June 16, 2021.

13.     Less than two months after the Merger closed, however, ATI shocked the market by revealing on July 26, 2021, that severe physical therapist attrition issues and  higher labor costs had resulted in drastically reduced financial guidance and caused the Company to only open between fifty-five to sixty-five new clinics, instead of the ninety new clinics promised.  The Company's stock price collapsed in response, going from $8.34 per share to just $4.72 per share on July 26, 2021, and then fell further to $3.82 per share on July 27, 2021.

14.     Then, on October 19, 2021, ATI revealed that it had to further reduce its revenue guidance, resulting in an additional decline in ATI's stock price, from $3.65 per share to $2.86 per share.  The Company's stock continues to trade around $1 per share.

15.     Putting their own interests before those of the Company and its stockholders, defendants caused the Company to overpay for Legacy ATI.  They accomplished this feat by concealing myriad problems ATI was facing at the time of the Merger, including:

          (a)     that ATI was experiencing attrition among its physical therapists;

          (b)     that ATI faced increasing competition for physical therapists in the labor market;

(c)     that ATI lacked the number of physical therapists necessary to accomplish its expansion plans; and

(d)     that as a result of the foregoing, the Company faced difficulties retaining therapists and incurred increased labor costs.

## JURISDICTION AND VENUE

16.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, 15 U.S.C. §78aa, this Court also has jurisdiction over the claims asserted herein for violations of section 14(a) and pursuant to section 21D for violations of the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

18.     Venue is proper in this District under 28 U.S.C. §§1391 and 1401 because: (i) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (ii) the defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

19.     Plaintiff Brendan Reginbald was a stockholder of ATI at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current ATI stockholder.  Plaintiff is a citizen of Georgia.

**Nominal Defendant**

20.     Nominal defendant ATI is a Delaware corporation with principal executive offices located at 790 Remington Boulevard, Bolingbrook, Illinois.  Accordingly, ATI is a citizen of Delaware and Illinois.  ATI is a healthcare company specializing in outpatient rehabilitation and adjacent services.  As of June 30, 2022, ATI had 926 clinics located in twenty-five states.  The Company was incorporated on June 10, 2020, as a special purpose acquisition company, FVACII. On June 16, 2021, FVACII completed a business combination with Legacy ATI, a portfolio company of Advent International Corporation ("Advent"), and upon closing of the Merger, proceeded to operate under the name ATI Physical Therapy, Inc.

**Sponsor Defendant**

21.     Defendant Sponsor is a Delaware limited liability company with principal executive offices located at 1345 Avenue of the Americas, 46th Floor, New York, New York. Accordingly, defendant Sponsor is a citizen of Delaware and New York.  On June 15, 2020, defendant Sponsor acquired 8,625,000 shares of FVACII's Class F common stock, or Founder Shares, totaling 100% of the Company's outstanding Class F common stock for an aggregate capital contribution of $25,000.  In August 2020, defendant Sponsor transferred a total of 100,000 Founder Shares to defendants Hood, Policy, Russak-Aminoach, and Gulati for the same per-share price initially paid by defendant Sponsor.  Defendant Fortress indirectly owns all of the outstanding equity interest in defendant Sponsor, and may be deemed to beneficially own the shares of common stock directly held by defendant Sponsor.  As Co-Chief Investment Officers of the fund that owns defendant Sponsor, defendants Andrew A. McKnight ("McKnight") and Joshua A. Pack ("Pack") participate in the voting and investment decisions with respect to shares of common stock held by defendant Sponsor but disclaim beneficial ownership thereof.

**Entity Defendant**

22.     Defendant Fortress is a Delaware limited liability company with principal executive offices at 1345 Avenue of the Americas. 46th Floor, New York, New York.  Accordingly, defendant Fortress is a citizen of Delaware and New York.  Defendant Fortress is a global investment manager with approximately $44.4 billion in assets under management as of June 30, 2022.  Defendant Fortress was founded in 1998 and manages assets on behalf of approximately 1,900 institutional clients and private investors.  As of June 30, 2022, defendant Fortress has approximately 896 employees.  Defendant Fortress indirectly owns all of the outstanding equity interest in defendant Sponsor, and may be deemed to beneficially own the shares of common stock directly held by defendant Sponsor.

**Individual Defendants**

23.     Defendant Labeed S. Diab ("Diab") was ATI's Chief Executive Officer ("CEO") and a director from June 2021 to August 2021.  Defendant Diab was Legacy ATI's CEO and a director from 2019 to June 2021.  Defendant Diab is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b), 14(a), and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9, promulgated thereunder.  Defendant Diab is a citizen of Texas.

24.     Defendant Joseph Jordan ("Jordan") has been ATI's Chief Financial Officer ("CFO") since June 2021.  Defendant Jordan was Legacy ATI's CFO from 2019 to June 2021 and Senior Vice President, Corporate Controller and Chief Accounting Officer from April 2018 to 2019.  Defendant Jordan is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b), 14(a), and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9, promulgated thereunder.  Defendant Jordan is a citizen of Illinois.

25.     Defendant John L. Larsen ("Larsen") has been ATI's Chairman of the Board since April 2022 and a director since June 2021.  Defendant Larsen has been an ATI Audit Committee member since June 2021.  Defendant Larsen was ATI's Executive Chairman of the Board from August 2021 to April 2022.  Defendant Larsen was also a Legacy ATI director from 2018 to June 2021.  Defendant Larsen is a citizen of Minnesota.

26.     Defendant John Maldonado ("Maldonado") has been an ATI director since June 2021.  Defendant Maldonado was a Legacy ATI director from 2016 to June 2021.  Defendant Maldonado is a citizen of Massachusetts.

27.     Defendant Carmine Petrone ("Petrone") has been an ATI director since June 2021.  Defendant Petrone was a Legacy ATI director from April 2016 to June 2021.  Defendant Petrone is a citizen of Massachusetts.

28.     Defendant Joanne M. Burns ("Burns") has been an ATI director since June 2021.  Defendant Burns has been an ATI Audit Committee member since June 2021.  Defendant Burns was a Legacy ATI director from January 2021 to June 2021.  Defendant Burns is a citizen of Arizona.

29.     Defendant James E. Parisi ("Parisi") has been an ATI director since June 2021.  Defendant Parisi has been ATI's Chairman of the Audit Committee since June 2021.  Defendant Parisi was a Legacy ATI director from February 2021 to June 2021.  Defendant Parisi is a citizen of Illinois.

30.     Defendant McKnight has been an ATI director since June 2021.  Defendant McKnight was also a FVACII director from June 2020 to June 2021 and CEO from August 2020 to June 2021.  Defendant McKnight was also defendant Sponsor's Chairman and a Managing Partner from August 2020 to at least June 2021.  Defendant McKnight is a member of defendant

- 10 -

Fortress' Management Committee and has been since February 2005; Co-Chief Investment Officer of the Credit & Lending Funds and has been since February 2005; and Managing Partner of the Credit Funds business and has been since March 2018. Defendant McKnight was also a Partner and Managing Director of Fortress' Credit Funds business from February 2005 to March 2018. Defendant McKnight is also Fortress Value Acquisition Corp. III's CEO and a director and has been since August 2020; Fortress Value Acquisition Corp. IV's Chairman of the Board and has been since August 2020; and a Fortress Value Acquisition Corp. director and has been since January 2020. Defendant McKnight was also Fortress Value Acquisition Corp.'s CEO from January 2020 to November 2020. Defendant McKnight signed the Agreement and Plan of Merger dated February 21, 2021 (the "Merger Agreement"). Defendant McKnight is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b), 14(a), and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9, promulgated thereunder. Defendant McKnight is a citizen of Texas.

  31. Defendant Pack was FVACII's Chairman of the Board and a director from August 2020 to June 2021. Defendant Pack was also defendant Sponsor's Managing Partner from August 2020 to at least June 2021. Defendant Pack is also a member of defendant Fortress' Management Committee; Managing Partner of the Credit Funds business; and Co-Chief Investment Officer of the Credit & Lending Funds and has been since 2002. Defendant Pack is Fortress Value Acquisition Corp. III's Chairman of the Board of Directors and a director and has been since January 2021, and also Fortress Value Acquisition Corp. IV's CEO and has been since March 2021 and a director and has been since at least October 2020. Defendant Pack was also Fortress Value Acquisition Corp.'s Chairman of the Board of Directors and a director from April 2020 to November 2020. Defendant Pack is named as a defendant in the related Securities Class Action

complaint that alleges he violated sections 10(b), 14(a), and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9, promulgated thereunder. Defendant Pack is a citizen of Texas.

32.     Defendant Marc Furstein ("Furstein") was a FVACII director from August 2020 to June 2021. Defendant Furstein was also defendant Sponsor's President from August 2020 to at least June 2021. Defendant Furstein is also a member defendant Fortress' Management Committee and President of Credit Funds and has been since July 2001. Defendant Furstein is a director of Fortress Value Acquisition Corp. III and has been since January 2021, and a director of Fortress Value Acquisition Corp. IV and has been since March 2021. Defendant Furstein is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b), 14(a), and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9, promulgated thereunder. Defendant Furstein is a citizen of California.

33.     Defendant Leslee Cowen ("Cowen") was a FVACII director from August 2020 to June 2021. Defendant Cowen was also a director of defendant Sponsor from August 2020 to June 2021. Defendant Cowen is also a member of defendant Fortress' Management Committee and a Managing Director and has been since June 2002. Defendant Cowen is a director of Fortress Value Acquisition Corp. III and has been since January 2021, and a director of Fortress Value Acquisition Corp. IV and has been since March 2021. Defendant Cowen is named as a defendant in the related Securities Class Action complaint that alleges she violated sections 10(b), 14(a), and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9, promulgated thereunder. Defendant Cowen is a citizen of New York.

34.     Defendant Hood was a FVACII director from August 2020 to June 2021. Defendant Hood was also a director of defendant Sponsor from August 2020 to June 2021. Defendant Hood was also a Fortress Value Acquisition Corp. director from May 2020 to

November 2020. In August 2020, defendant Sponsor transferred 25,000 Founder Shares to defendant Hood for the same per-share price initially paid by defendant Sponsor. Defendant Hood is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b), 14(a), and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9, promulgated thereunder. Defendant Hood is a citizen of New York.

35. Defendant Policy was a FVACII director from August 2020 to June 2021. Defendant Policy was also a director of defendant Sponsor from August 2020 to June 2021. Defendant Policy was also a Fortress Value Acquisition Corp. director from June 2020 to November 2020. In August 2020, defendant Sponsor transferred 25,000 Founder Shares to defendant Policy for the same per-share price initially paid by defendant Sponsor. Defendant Policy is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b), 14(a), and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9, promulgated thereunder. Defendant Policy is a citizen of California.

36. Defendant Russak-Aminoach was a FVACII director from August 2020 to June 2021. Defendant Russak-Aminoach was also a director of defendant Sponsor from August 2020 to June 2021. In August 2020, defendant Sponsor transferred 25,000 Founder Shares to defendant Russak-Aminoach for the same per-share price initially paid by defendant Sponsor. Defendant Russak-Aminoach is named as a defendant in the related Securities Class Action complaint that alleges she violated sections 10(b), 14(a), and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9, promulgated thereunder. Defendant Russak-Aminoach is a citizen of Israel.

37. Defendant Gulati was a FVACII director from August 2020 to June 2021. Defendant Gulati was also a director of defendant Sponsor from August 2020 to June 2021. In August 2020, defendant Sponsor transferred 25,000 Founder Shares to defendant Gulati for the

same per-share price initially paid by defendant Sponsor. Defendant Gulati is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b), 14(a), and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9, promulgated thereunder. Defendant Gulati is a citizen of New York.

38.     The defendants identified in ¶¶23-24 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶23, 25-30 are referred to herein as the "Director Defendants." The defendants identified in ¶¶30-37 are referred to herein as the "FVACII Defendants." The defendants identified in ¶¶23-29 are referred to herein as the "Legacy ATI Defendants." Collectively, the defendants identified in ¶¶23-37 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

39.     By reason of their positions as officers and/or directors of ATI and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner.

40.     Each Individual Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of their personal interest or benefit.

41.     In *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009), the Delaware Supreme Court concluded that the "officers of Delaware corporations, like directors, owe fiduciary duties

of care and loyalty, and that the fiduciary duties of officers are the same as those of directors."
The officers of a Delaware corporation are "expected to pursue the best interests of the company
in good faith (i.e., to fulfill their duty of loyalty) and to use the amount of care that a reasonably
prudent person would use in similar circumstances (i.e., to fulfill their duty of care)." *Hampshire
Grp., Ltd. v. Kuttner*, No. 3607-VCS, 2010 WL 2739995, at *11 (Del. Ch. July 12, 2010).

42.     Because of their positions of control and authority as officers and/or directors of
ATI, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control
over the wrongful acts complained of herein.  Because of their advisory, executive, managerial,
and directorial positions with ATI, each of the Individual Defendants had knowledge of material,
nonpublic information regarding the Company.  In addition, as officers and/or directors of a
publicly held company, the Individual Defendants had a duty to promptly disseminate accurate
and truthful information regarding the Company's business, operations, and prospects so that the
market price of the Company's stock would be based on truthful and accurate information.

43.     At all times relevant hereto, each of the Individual Defendants was the agent of
each of the other Individual Defendants and of ATI and was at all times acting within the course
and scope of such agency.

44.     To discharge their duties, the officers and directors of ATI were required to exercise
reasonable and prudent supervision over the management, policies, practices, and controls of the
Company.  By virtue of such duties, the officers and directors of ATI were required to, among
other things:

(a)     exercise good faith to ensure that the affairs of the Company were
conducted in an efficient, business-like manner so as to make it possible to provide the highest
quality performance of their business;

(b)     exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of ATI are conducted in accordance with all applicable laws, rules, and regulations;

(d)     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

(e)     truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

45.     Additionally, as a part of their duties of care and loyalty, the Individual Defendants had a fiduciary duty to disclose all material information whenever they voluntarily chose to speak to ATI stockholders, or the market generally, about the business of the corporation. *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) ("Corporate fiduciaries can breach their duty of disclosure under Delaware law ... by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading.") (citation omitted); *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998) ("[D]irectors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances."); *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) ("[D]irectors are under a fiduciary obligation to avoid misleading partial disclosures.  The law of partial disclosure is likewise clear: '[O]nce defendants travel[] down

the road of partial disclosure ... they ... [have] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events."") (citation omitted); *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977) (holding the defendants breached their fiduciary duty of candor when they failed to disclose material information to minority shareholders to whom they owed a fiduciary duty).

46.     As the Delaware Supreme Court explained in *In re Tyson Foods, Inc. Consolidated Shareholder Litigation*, No. 1106-CC, 2007 WL 2351071, at *4 (Del. Ch. Aug. 15, 2007), "[w]hen ... directors communicate with shareholders, they also must do so with complete candor":

> Loyalty.  Good faith.  Independence.  Candor.  These are words pregnant with obligation.  The Supreme Court did not adorn them with half-hearted adjectives. Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor.

**Additional Duties of the Director Defendants Serving on the Audit Committee**

47.     The Charter for the Audit Committee charges members with responsibility for, among other things, "the performance of [ATI's] internal audit function and systems of internal control over financial reporting and disclosure controls and procedures."

48.     Specifically regarding risk management, the Charter states that the Audit Committee shall:

> ... review and discuss with management, the head of the Company's Enterprise Risk Management ("ERM") program, the head of the internal audit function (as applicable) and the independent auditor any significant risks or exposures, (including litigation, financial, and cybersecurity risks) and the Company Group's underlying policies with respect to risk assessment and risk management, and assess the steps management has taken to monitor and control such risks, except with respect to those risks for which oversight has been assigned to other committees of the Board or retained by the Board; and review the Company's annual disclosures concerning the role of the Board in the risk oversight of the Company[.]

49.     The Company's 2021 Annual Report states, with respect to the role of the Board in risk oversight:

The Board is responsible for overseeing our risk management process. The Board will focus on our general risk management strategy, the most significant risks facing us, and oversee the implementation of risk mitigation strategies by management. Our Audit Committee is also responsible for discussing our policies with respect to risk assessment and risk management.

## **FACTUAL BACKGROUND**

50.     SPACs, also known as "blank-check companies," are publicly traded shell corporations created to merge with privately held businesses. Once a SPAC identifies a target and they agree to a deal, the parties effect a business combination through a reverse merger.

51.     This transactional structure allows the target company to take the SPAC's place on a public exchange, permitting the target to bypass the traditional IPO process while allowing its equity to become publicly traded in an expedited manner without the traditional regulatory scrutiny.

52.     In addition, while the traditional IPO process lets investors as a whole (i.e., the market) set the price at which the company is valued, the SPAC process switches the usual order of events. With a SPAC, investors can buy shares of the empty-shell public entity in order to have the "opportunity" to see their shares converted into shares of an as-yet unidentified operating business. In other words, investors rely on the managers of the SPAC in which they invest to find the right opportunity for an acquisition in order to create value.

53.     Most SPACs follow the same basic structure. A SPAC will raise funds from public investors through an IPO and will hold those funds in "trust" for those investors while the SPAC seeks an acquisition target. The SPAC will then have a "completion window"—generally two years—to identify and execute a business combination. If the SPAC fails to do so during the completion window, it must then return the funds in trust to its public stockholders with interest, after which the SPAC dissolves.

54.     If the SPAC does identify a target and proposes a business combination, but certain SPAC public stockholders do not like the deal, these stockholders have the right to redeem their stock for approximately the same amount as their initial investment, plus interest, minus some expenses.   Critically, the value of the redemption right is directly tied to the quality of the disclosures surrounding the proposed acquisition.  Unfortunately, disclosures surrounding SPAC deals are, to date, far less regulated than those made in connection with an IPO.  For instance, unlike with traditional IPOs, in a SPAC merger there is no road show where institutional investors and analysts can ask questions of management and no "quiet period" or practical prohibition on disclosure of projections.

55.     The common SPAC structure also creates problematic incentives for its founders, whose interests are not directly aligned with those of the public investors.  In a typical SPAC, founders receive, for a nominal price, "Founder Shares," often amounting to 20% of the post-IPO, pre-business combination stock of the blank-check company.

56.     Once the SPAC finds a business combination to effectively take a company public, these Founder Shares convert into regular common stock of the post-merger company.  As a result, founders are greatly incentivized to complete a deal prior to the close of the completion window even if that deal is not the best outcome for SPAC public stockholders.  In many SPACs, Founder Shares are worthless absent any business combination.  However, upon the consummation of a business combination and subsequent stockholder approval, Founder Shares provide massive windfalls for their holders.

57.     Because the SPAC founders control the investment and financing decisions of a SPAC with little, if any, oversight, additional inherent conflicts exist as well.  For example, because the Founder Shares received by the SPAC founders often cost them mere pennies per

share, any business combination made before the SPAC must return its stockholders' money will generate millions of dollars of value for the founders, at even modest valuations, assuming stockholders ultimately approve the combination and do not redeem their shares beyond a threshold level. This is a spectacular return on their initial investment and money the SPAC founders would not receive if they failed to find a purportedly suitable business combination.

58. Also, founders often allow themselves and selected investors to participate in additional investments—at especially favorable terms—to their SPAC acquisitions through private warrant placements and private investment in public equity, or "PIPE," financings. In an IPO, the underwriters buy the shares to be issued, and then sell those shares to investors of their choosing. When a SPAC conducts an acquisition using this form of PIPE financing, the SPAC managers essentially dilute the existing SPAC investors by selecting their preferred investors—whether they are existing SPAC investors or not—who will acquire cheap post-deal equity by providing the financing for a PIPE deal.

59. Finally, SPAC employees who would otherwise lose their employment upon the termination of the SPAC are incentivized to find a purportedly suitable target in order to maintain employment at the acquired company. SPAC employees are similarly incentivized to choose a certain target based on the level of compensation they could expect to receive as an employee of one acquisition target in comparison to another. Ultimately, these incentives may cause SPAC employees to disregard problems at an acquisition target they favor or present a preferred target in a misleadingly favorable light to ensure that target is selected and ultimately approved by stockholders. FVACII acknowledged these conflicts, stating in its Registration Statement filed on Form S-1 with the SEC on July 24, 2020 (the "Registration Statement"), as follows:

> Our key personnel may negotiate employment or consulting agreements with a target business in connection with a particular business combination. These

agreements may provide for them to receive compensation following our initial business combination and as a result, may cause them to have conflicts of interest in determining whether a particular business combination is the most advantageous.

60.     FVACII's Registration Statement represented that FVACII "currently [did] not have any specific business combination under consideration."  As defendant McKnight later revealed on February 22, 2021, however, FVACII "followed ATI for a long time, having been an investor in the credit for over ten years. Since Advent bought the business in 2016, [FVACII] watched and admired the company's growth, in particular [ATI's] approximately 300 new clinics through their de novo growth effort."

61.     Legacy ATI was an outpatient physical therapy provider in the United States.  In 2016, Advent acquired a majority position in Legacy ATI.

62.     As a result of their conflicts of interests, defendants targeted ATI and issued materially false and misleading statements in support of the Merger which were designed to entice stockholders to vote in favor of the Merger and discourage stockholders from exercising their redemption rights in order to effectuate the Merger.

## THE FVACII DEFENDANTS CAUSE THE COMPANY TO OVERPAY FOR LEGACY ATI AS A RESULT OF AN UNFAIR PROCESS

63.     Defendant Fortress formed FVACII as one of a series of SPACs.  All the FVACII Defendants except for defendant Gulati signed or consented to the Registration Statement. According to the Registration Statement, FVACII was organized as a blank-check company for the purpose of effecting a merger, capital stock exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses.  FVACII stated that it could pursue an acquisition opportunity in any business, industry, sector, or geographical location.  Defendants stated in the Prospectus on Form 424B4 filed with the SEC on August 13,

2020, that they "have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target."

64.    The only guidance provided in the Registration Statement about the potential acquisition was that defendants "intend[ed] to identify and acquire a business that could benefit from a hands-on owner with extensive investment and operational expertise and that presents potential for an attractive risk-adjusted return profile under our stewardship."  The Registration Statement touted defendants McKnight and Pack as previously running a similar blank-check company and engaging in a supposedly successful business combination in 2020.

65.    Prior to the IPO, the Sponsor purchased 8.625 million shares of the Company's Class F common stock, commonly referred to as "Founder Shares."  The Sponsor paid $25,000 for these Founder Shares, which would convert, in the event of a business combination, to an amount equal to 20% of the sum of the total number of all shares of common stock outstanding after the business combination.  The holders of the Founder Shares had the right to elect all of the Company's directors prior to the initial business combination.

66.    As detailed above, half of the directors of the Company before the initial business combination were insiders at Fortress.   In addition, in June 2020, the Sponsor transferred 25,000 Sponsor shares to the supposedly "independent directors" on the FVACII Board, defendants Hood, Policy, Russak-Aminoach, and Gulati.

67.    Accordingly, immediately before its IPO, FVACII had all the conflicts of interests detailed above that render many SPACs problematic and encourage a deal at any price without proper diligence, including: (i) the 20% ownership from Founder Shares; (ii) a windfall if any business combination is accomplished; (iii) favored investors getting sweetheart deals for cheap

shares; (iv) little oversight over what business combination the sponsor seeks to accomplish; and (v) a ticking window in which the stock would expire as worthless.

68.     Defendant Fortress took FVACII public on August 14, 2020.  On that day, FVACII sold 34.5 million units at a price of $10 per unit (including the underwriters' full exercise of their over-allotment) for gross proceeds of $345 million.   Each unit consisted of one share of the Company's Class A common stock and one-fifth of one warrant, with each whole warrant enabling the holder thereof to purchase one share of Class A common stock at a price of $11.50 per share. Defendants had twenty-four months from the IPO to enter into a business combination in order to reap tens of millions of dollars in benefits.

69. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███

70. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████

-------------------

[1] All references to "ATI_220_____" are to the Section 220 production of documents in response to plaintiff's inspection demand.

71. ███████████████████████████████████████████

███████████████████████████████████

72. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

73. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████ .

74. ██████████████████████████████████████████████

██████████████████████████

    ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████ .

75. ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████

76. ████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████

77. ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████

78. ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

79.

80.     Under the Merger Agreement, Legacy ATI was required to provide this information to the Company in the event FVACII asked.  Merger Agreement, section 6.3.  In addition, the Merger Agreement required the Company to provide Legacy ATI any public filings with the SEC and gave Legacy ATI the opportunity to review and comment on such filings before their issuance or submission.  Merger Agreement, section 6.8.  The Company was also required to accept and incorporate all reasonable comments from Legacy ATI on the filings.  *Id.*

**THE INDIVIDUAL DEFENDANTS BREACH THEIR FIDUCIARY DUTY, AID AND ABET THIS BREACH, AND VIOLATE SECTION 14A OF THE EXCHANGE ACT BY MAKING MATERIALLY FALSE AND MISLEADING STATEMENTS**

81.     On February 22, 2021, just six months after FVACII went public defendants announced

in a Current Report on Form 8-K filed by FVACII with the SEC that FVACII would combine with Legacy ATI. Legacy ATI was a portfolio company of private equity firm Advent. Legacy ATI claimed to own and operate nearly 900 physical therapy clinics with more than 5,000 physical therapists nationwide.

82. As part of the Merger, Legacy ATI would receive up to $645 million in cash from FVACII and certain private investors. The Merger terms valued the combined company at $2.5 billion. Under the terms of the deal, assuming no redemptions, FVACII's outside stockholders would own only 16.6% of the outstanding common stock in the Company. Legacy ATI stockholders would own approximately 69% of the Company's Class A common stock. The Founder Shares would convert into Class A common shares and, once fully vested, would equate to approximately 20% of the Company.

83. Defendant Sponsor and certain other investors agreed to engage in a PIPE transaction in connection with the Merger. The Sponsor purchased 7.5 million shares at a price of $10 per share, equating to approximately 3.61% of the outstanding Class A common stock after the business combination.

84. Approval of the Merger required an affirmative vote by FVACII stockholders at the special meeting, with the holders of the Founder Shares and the Class A common stock voting together. In addition, FVACII would not consummate the Merger if FVACII had net tangible assets of less than $5,000,001 after taking into account the redemption for cash of all public shares properly demanded to be redeemed by the Company's stockholders. A further mutual minimum cash condition of the Merger, which could be waived by the parties, required that FVACII have at least $472.5 million in available cash immediately prior to the consummation of the Merger after taking into account stockholder redemptions and net proceeds from the PIPE investment.

85.     In connection with the Form 8-K announcement on February 22, 2021, FVACII included as an exhibit an investor presentation.  The presentation stated that Legacy ATI projected revenue of $731 million and adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $119 million in 2021, with those numbers being negatively affected by "COVID-19 Disruption."  For the future, the Company stated it expected revenue of $903 million in 2022 and $175 million in adjusted EBITDA in 2022, with a "[c]lear [p]ath to $200+ million of [adjusted] EBITDA and [b]eyond."  Part of this "clear path" was that Legacy ATI had a "[d]eep pipeline to support 90+ de novo clinics in 2021."  The presentation also claimed that "De Novo [new clinic location openings] are Highly Accretive & Predictable."  Legacy ATI, according to the presentation, was "[b]uilt [f]or [s]calability" with "[c]ontinued improvements in clinical labor management model…."  Further, during the COVID-19 pandemic, Legacy ATI "enhanced" itself by creating an "[a]ccelerated staffing strategy."

86.     ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████

87.     The investor presentation also demonstrated the importance of "[c]linic-[l]evel [e]xpenses."  For the 2018 and 2019 fiscal years, clinic-level expenses accounted for 78% and

73.7% of revenues, respectively. Legacy ATI expected clinic-level expenses to account for 77.6% of revenues in 2020.

88.     The Company also held an investor conference call that same day. In connection with the announcement on February 22, 2021, FVACII filed the transcript of the call as an exhibit to the Form 8-K. During the call, defendant Diab, Legacy ATI's CEO, claimed that Legacy ATI "has a fantastic culture, a very high retention, low turnover." Defendant Diab also discussed that Legacy ATI had already identified an additional 900 clinics that the Company could open over the next ten years. Defendant Jordan, Legacy ATI's CFO, claimed that Legacy ATI's process for opening new clinics is "deeply rooted in analytics," and that "our process is extremely granular and analytically driven." Defendant Jordan also highlighted that Legacy ATI even considers traffic patterns at potential clinic locations.

89.     On March 12, 2021, FVACII filed a Preliminary Proxy Statement on Form PREM14A with the SEC (the "Preliminary Proxy"), soliciting votes in favor of the Merger. The Preliminary Proxy discussed the Company's "competitive compensation model" and "favorable clinician retention rates and engagement scores" and stated that ATI has "historically been able to realize high retention rates across [the] organization." Among the material factors that FVACII's Board purportedly considered as supporting approval of the Merger, the Preliminary Proxy listed ATI's "Attractive Recruiting and Retention Capabilities" as compared to other companies in the industry, "which allows the Company to recruit and retain talent." Moreover, the Preliminary Proxy stated that the Company projected revenue of $731 million and adjusted EBITDA of $119 million in 2021. Finally, in the Preliminary Proxy, the Company stated that as of December 31, 2020, the "goodwill" of the Company was $1,330,085,000 and that the "trade name and other

intangible assets, net" of the Company was $644,339,000. ████████████

████████████████████████████████████████████ [2]

90.     On April 1, 2021, FVACII filed additional solicitation materials with the SEC, including slides from FVACII's Analyst Day presentation.  The presentation included a twenty-minute long "De Novo Clinic Deep Dive."  The presentation slides reiterated many of the same points as the February 22, 2021 investor presentation, including the Company's "[a]ccelerated staffing strategy," "[d]eep pipeline to support 90+ de novo clinics in 2021," and "improvements in [its] clinical labor management model."  Recognizing the importance of physical therapists and clinicians, the presentation stated that Legacy ATI was the "Employer of Choice for [Physical Therapy] Clinicians" with a "[b]est-in-class infrastructure built to attract, develop, and retain future leaders in [physical therapy]."  The presentation actually stated that through "[c]linic [s]taffing [o]ptimization" there would be "[s]ignificant labor savings through [a] more productive staffing model."  The Company reiterated expected revenue of $731 million for 2021 and adjusted EBITDA of $119 million for the year.  The presentation also said that there would be normalized volumes in 2022, with expected revenue of $903 million and adjusted EBITDA of $175 million.

---

[2] ATI, 220 Production Privilege Log at 2.



91. On May 5, 2021, FVACII filed an amendment to the Preliminary Proxy with the SEC, soliciting votes in favor of the Merger, in which it again discussed ATI's "competitive compensation model" and purported "favorable clinician retention rates and engagement scores" and stated that ATI has "historically been able to realize high retention rates across [the] organization." Among the material factors that FVACII's Board purportedly considered as supporting approval of the Merger, the amendment to the Preliminary Proxy listed ATI's "Attractive Recruiting and Retention Capabilities" as compared to other companies in the industry, "which allows the Company to recruit and retain talent." Moreover, the amendment to the Preliminary Proxy again stated that the Company projected revenue of $731 million and adjusted EBITDA of $119 million in 2021. Finally, in the amendment to the Preliminary Proxy, the

Company stated that as of December 31, 2020, the "goodwill" of the Company was $1,330,085,000 and that the "trade name and other intangible assets, net" of the Company was $644,339,000.

92. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

93. Also on May 14, 2021, the Company filed the Proxy with the SEC, soliciting stockholder votes in favor of the Merger. The Proxy alerted stockholders that the Company would have a special meeting to consider the merger proposal on June 15, 2021. The Proxy also explained that stockholders could redeem their public shares for a cash amount equal to their pro rata share of the amount in a trust account up to two business days prior to the consummation of the Merger.

94. Like FVACII's other SEC filings leading up to the Merger, the Proxy contained false and misleading statements. The Proxy warned that labor costs "may increase," a risk that, as described below, was already occurring. In particular, the Proxy stated:

**Risks Relating to the Company's Human Resources**

***The Company's facilities face competition for experienced physical therapists and other clinical providers that may increase labor costs and reduce profitability.***

The Company's ability to attract and retain clinical talent is critical to its ability to provide high quality care to patients and successfully cultivate and maintain strong relationships in the communities it serves. If the Company cannot recruit and retain its base of experienced and clinically skilled therapists and other clinical providers, management and support personnel, its business may decrease and its revenues may decline. The Company competes with other healthcare providers in recruiting and retaining qualified management, physical therapists and other clinical staff and support personnel responsible for the daily operations of its business, financial condition and results of operations.

The Company may also experience increases in its labor costs, primarily due to higher wages and greater benefits required to attract and retain qualified healthcare personnel, and such increases may adversely affect the Company's profitability. Furthermore, while the Company attempts to manage overall labor costs in the most

efficient way, its efforts to manage them may have limited effectiveness and may lead to increased turnover and other challenges.

95.    In addition, the Proxy led stockholders to believe that this risk was negated by Legacy ATI's "[a]ttractive [r]ecruiting and [r]etention [c]apabilities. The belief that the Company is considered an attractive place to work compared to others in its industry, which allows the Company to recruit and retain talent." Further, the Proxy discussed ATI's purported "favorable clinician retention rates and engagement scores" and claimed that "[it has] a robust human resources organization that is built to attract, develop, and retain future leaders in physical therapy. ... Combined with a competitive compensation model, we have historically been able to realize high retention rates across our organization." Moreover, the Proxy again stated that the Company projected revenue of $731 million and adjusted EBITDA of $119 million in 2021. Finally, in the Proxy, the Company stated that as of December 31, 2020, the "goodwill" of the Company was $1,330,085,000 and that the "trade name and other intangible assets, net" of the Company was $644,339,000.

96.



97. ███████████████████████████████████

98. ███████████████████████████████████

99. ███████████████████████████████████



100.     On May 20, 2021, FVACII issued a press release announcing Legacy ATI's financial results for the first quarter ended March 31, 2021.  FVACII filed a copy of the press release with the SEC on Schedule 14A and designated the document as "Definitive Additional Materials."  In the press release, defendant Diab claimed that Legacy ATI was "on track to achieve our de novo development targets for the year" after opening fourteen new clinics.  Defendant Diab also stated that at Legacy ATI, "we are focused on accelerating hiring to serve outsized demand in specific markets, continuing our growth with a fast pace of new clinic openings and new potential strategic partnerships…."  In the same press release, defendant Jordan stated, "[a]s visits increased each month, we were able to better leverage fixed costs and improve labor productivity.  As volume continues to recover, we are excited to fully utilize our platform and deliver margin improvements."

101.     That same day, FVACII separately filed with the SEC a document on Schedule 14A, designated as "Definitive Additional Materials" to the Proxy, which included ATI's financial results for the first quarter of 2021.  Discussing trends and factors affecting the Company's future performance, the additional materials stated that "the Company implemented measures to reduce

labor-related costs in relation to the reduced visit volumes through reduced working schedules, voluntary and involuntary furloughs and headcount reductions," but that, beginning in the first quarter of 2021, visit volumes increased, and that "the Company continues to match its clinical staffing levels accordingly." The additional materials also included a chart titled, "Wilco Holdco, Inc. Consolidated Condensed Balance Sheets," reflecting that as of March 31, 2021, the "goodwill" of Legacy ATI was $1,330,085,000 and that the "trade name and other intangible assets, net" of Legacy ATI was $644,934,000.

102. On May 24, 2021, FVACII filed slides of a "Health Care Conference Presentation" presented to investors by Legacy ATI with the SEC on Schedule 14A, designated as "Additional Proxy Materials" to the Proxy. The presentation slides reiterated many of the previous statements, including the 2021 financial guidance, the "[c]lear [p]ath to $200+ million of [adjusted] EBITDA and [b]eyond," "[s]ignificant labor savings through [a] more productive staffing model," and Legacy ATI's "[d]eep pipeline to support 90+ de novo clinics in 2021." The presentation also stated that a "key focus" for 2021 was to "[c]ontinue to grow through new clinic openings." Moreover, the additional materials again stated that the Company projected revenue of $731 million and adjusted EBITDA of $119 million in 2021.

103. FVACII held the stockholder special meeting on the Merger on June 15, 2021. Based on the false statements in the Preliminary Proxy, the Proxy, and subsequent additional materials to the Proxy in related SEC filings, FVACII's stockholders voted in favor of the Merger and roughly 74% of stockholders elected not to redeem their shares before the June 11, 2021 redemption deadline. The other 26% of Class A stockholders redeemed approximately $90 million worth of stock before the close of the Merger. The Merger closed on June 16, 2021, and the post-Merger Company now trades on the New York Stock Exchange under the ticker symbol "ATIP."

104. On June 17, 2021, ATI issued a press release announcing that it had completed the business combination, stating, in relevant part:

> ATI Physical Therapy, Inc. ("ATI" or the "Company"), a portfolio company of Advent International ("Advent") and one of the nation's largest providers of outpatient physical therapy services, has completed its business combination with Fortress Value Acquisition Corp. II ("FVAC II") (NYSE: FAII), a special purpose acquisition company.

> The transaction, which was approved on June 15, 2021 by FVAC II's shareholders, further positions ATI to lead the rapidly growing physical therapy industry, with an emphasis on delivering predictable outcomes for patients with musculoskeletal (MSK) issues. Beginning June 17, 2021, the Company will operate as "ATI Physical Therapy, Inc.," and ATI's shares of Class A common stock will trade on the New York Stock Exchange ("NYSE") under the symbol "ATIP."

## REASONS THE STATEMENTS WERE MISLEADING

105. Each of the above statements were materially misleading because they failed to disclose:

(a) that ATI was experiencing attrition among its physical therapists;

(b) that ATI faced increasing competition for clinicians in the labor market;

(c) that as a result of the foregoing, the Company faced difficulties retaining therapists and incurred increased labor costs; and

(d) that as a result of the labor shortage, the Company would open fewer new clinics.

## THE TRUTH EMERGES

106. Before the market opened on July 26, 2021, just over a month after the business combination was consummated, ATI issued a press release reporting its financial results for the second quarter of 2021, the period in which the business combination was completed. ATI reported, among other things, that "the acceleration of attrition among [its] therapists in the second quarter and continuing into the third quarter, combined with the intensifying competition for

clinicians in the labor market, prevented us from being able to meet the demand we have and increased our expectations for labor costs."

107.    Though ATI was implementing certain remedial actions, the Company reduced its fiscal 2021 forecast due to the foregoing factors.  Specifically, the press release stated, in relevant part:

> "I would like to thank our nationwide team for their dedication, service and tireless effort providing the highest quality clinical care to our patients that makes ATI a leader in the large and growing physical therapy industry," said Labeed Diab, Chief Executive Officer. "We are seeing growing demand for ATI's services, and visit volume increased during the second quarter. However, *the acceleration of attrition among our therapists in the second quarter and continuing into the third quarter, combined with the intensifying competition for clinicians in the labor market, prevented us from being able to meet the demand we have and increased our expectations for labor costs.* We are implementing a range of actions related to compensation, staffing levels and other items to retain and attract therapists across our platform to meet our currently underserved patient demand. *We expect therapist headcount to be below previously anticipated levels for 2021 which, combined with elevated costs for therapists and an unfavorable revenue mix, has caused us to reduce our forecast for 2021.* We continue to have confidence in the underlying fundamentals driving our business and our ability to leverage our strong position in the market to drive growth and value over time."
>
> *    *    *
>
> **2021 Earnings Forecast**
>
> For full year 2021, ATI is now projecting revenue to be in the range of $640 million to $670 million and Adjusted EBITDA to be in the range of $60 million to $70 million, down from $731 million and $119 million, respectively. ATI does not intend to provide revenue guidance as a future guidance metric. The revised expectations reflect the impact of the following developments which are partially offset by continued strong demand for ATI's services:
>
> - The acceleration of attrition in the second quarter and continuing into the third quarter caused, in part, by changes made during the COVID-19 pandemic related to compensation, staffing levels and support for clinicians. ATI has taken swift actions to offset those changes, but the company expects the impact of attrition in the second and third quarters will impact overall profitability for the year.
>
> - Labor market dynamics that increased competition for the available physical therapy providers in the workforce, creating wage inflation and

elevated employee attrition at ATI, negatively affecting our ability to capitalize on continued customer demand.

- Decrease in rate per visit primarily driven by continuing less favorable payor and state mix when compared to pre-pandemic profile, with general shift from workers compensation and auto personal injury to commercial and government, and further impacted by mix-shift out of higher reimbursement states.

*Largely in response to the accelerated attrition, ATI is lowering its estimate for new clinic openings, (i.e., de novo and acqui-novo clinics), to be in the range of 55 to 65 clinics from 90 clinics.* Our ability to achieve our revised forecast for the remainder of 2021 depends upon a number of factors, including the success of a number of steps being taken to significantly reduce attrition of physical therapists and significant hiring of physical therapists.

The Company has determined that the revision to its 2021 forecast constitutes an interim triggering event that requires further analysis with respect to potential impairment to goodwill and trade name intangible assets. *Accordingly, the Company is currently performing interim quantitative impairment testing during the third quarter of 2021*. If it is determined that the fair value amounts are below the respective carrying amounts, the Company will record an impairment charge which could be material.

108.    On this news, the Company's share price fell $3.62, or 43%, to close at $4.72 per share on July 26, 2021, on unusually heavy trading volume.  The share price continued to decline the next trading session by as much as 19%.

109.    In ATI's Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 Form 10-K") filed with the SEC on March 1, 2022, which was signed by defendants Larsen, Jordan, Maldonado, Petrone, Burns, Parisi, and McKnight, the Company admitted the revision to its forecast was a triggering event that had significant ramifications.  The 2021 Form 10-K also contained certifications pursuant to section 906 of the Sarbanes-Oxley Act of 2002, signed by defendants Larsen and Jordan attesting to the accuracy of the contents therein.  Specifically,

The Company determined that the revision to its forecast in late July 2021, including the factors related to the revision of its forecast, constituted an interim triggering event that required further analysis with respect to potential impairment to goodwill, trade name indefinite-lived intangible and other assets. Accordingly, the Company performed interim quantitative impairment testing and determined

- 39 -

that the fair value amounts were below the respective carrying amounts. As a result, the Company recorded non-cash impairment charges of $419.4 million related to goodwill and $33.7 million related to the trade name indefinite-lived intangible asset as of the June 30, 2021 balance sheet date.

## **DAMAGES TO ATI**

110. As a direct and proximate result of the Individual Defendants' misconduct, ATI has been seriously harmed and will continue to be. Such harm includes, but is not limited to: (i) legal fees incurred in connection with the defense of the related Securities Class Action; (ii) any funds paid to settle or fund a judgment entered in the Securities Class Action; (iii) costs incurred from compensation and benefits paid to the defendants who have breached their duties to ATI; and (iv) costs incurred in the unfair Merger, including the amount the Company overpaid for Legacy ATI.

111. In addition, ATI's business, goodwill, and reputation with its business partners, regulators, and stockholders have been gravely impaired. The Company still has not fully admitted the nature of its false statements and the true condition of its business. The credibility and motives of management are now in serious doubt.

112. These actions have damaged both ATI's corporate image and goodwill. For at least the foreseeable future, ATI will suffer from what is known as the "liar's discount," a term applied to the stock of companies who have been implicated in misleading the investing public, such that ATI's ability to raise equity capital or debt on favorable terms in the future is now and will continue to be impaired. The Company stands to incur higher marginal costs of capital and debt because of the misconduct.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

113. Plaintiff brings this action derivatively in the right and for the benefit of ATI to redress injuries suffered, and to be suffered, by ATI as a direct result of breaches of fiduciary duty by the Individual Defendants, contribution for violation of section 10(b) pursuant to Section 21D

of the Exchange Act, and violation of section 14(a) of the Exchange Act.  ATI is named as a nominal defendant solely in a derivative capacity.

114.    Plaintiff will adequately and fairly represent the interests of ATI in enforcing and prosecuting its rights.

115.    Plaintiff has continuously been a stockholder of ATI at times relevant to the wrongdoing complained of and is a current ATI stockholder.

116.    ATI's Board consists of following nine directors: defendants Larsen, Maldonado, Petrone, Burns, Parisi, and McKnight and non-defendants Daniel V. Dourney, Teresa Sparks, and Sharon Vitti ("Vitti").  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below.

**Defendants Larsen, Maldonado, Petrone, Burns, Parisi, and McKnight Face a Substantial Likelihood of Liability**

117.    Demand is futile because defendants Larsen, Maldonado, Petrone, Burns, Parisi, and McKnight face a substantial likelihood of liability for breaching their fiduciary duties of loyalty and aiding and abetting such breaches. ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ Nevertheless, they were necessary participants in the scheme to overpay for Legacy ATI and ████████████████████████████

██████████████ Accordingly, they each aided and abetting the FVACII Defendants' breaches of fiduciary duties.  Defendant McKnight, as a FVACII Defendant, was on both sides of the

transaction and approved the Merger without doing appropriate due diligence and while making misleading statements.

118.    Demand Board members further violated section 14(a) of the Exchange Act by negligently making material misstatements and omitting material facts in connection with their proxy solicitations, as described herein.

119.    Accordingly, all members of the Demand Board face a substantial likelihood of liability for their breaches of fiduciary duty and violations of state and federal law, making any demand upon them futile.

**Demand Is Excused Because a Majority of the Board Is Interested in the Merger**

120.    A majority of the Board also cannot consider a demand because they had interests in and were set to benefit as a result of the consummation of the Merger and are thus hopelessly conflicted due to the Merger.

121.    Advent is the Company's controlling stockholder, owning over 116 million shares, approximately 56% of the Company's stock.  At the time of the closing of the Merger, Advent's ownership of ATI was valued at $1.3 billion.  Even as ATI's stock has continued to fall, Advent's stock is still worth hundreds of millions of dollars.

122.    Advent entered into an agreement with FVACII in connection with the closing of the Merger.  Pursuant to this agreement, as long as Advent holds at least 50% of the Company's common stock it has the right to designate five directors to the Board.  Advent's Board designees are defendants Petrone, Maldonado, Larsen, Burns, and Parisi.

123.    Defendant Petrone is the Managing Director of Advent and defendant Maldonado is the Managing Partner of Advent.  Defendants Petrone and Maldonado will not vote to initiate

litigation challenging a transaction that results in hundreds of millions of dollars in value to their principal employer.

124.    Defendant Larsen is one of Advent's go-to directors.  He has served on the board of directors of AccentCare, Inc. ("AccentCare") since 2019 and has been the Chairman of the board of AccentCare since 2021.  AccentCare is an Advent portfolio company.  In that role, defendant Larsen has worked alongside defendants Maldonado and Petrone, who are also directors of AccentCare.  Defendant Larsen was a member of the leadership team fulfilling the role of CEO after defendant Diab stepped down.  When defendant Larsen was appointed to Executive Chair of the Board, ATI chose to pay him an additional $720,000, of which he received over $555,000 over six months in 2021.  Defendant Larsen had an annualized salary for 2021 of $1.44 million.  Including stock and option awards, defendant Larsen received over $1.145 million in 2021 from ATI for effectively serving as one of a number of individuals fulfilling the role of CEO for six months.  Defendant Larsen received these payments pursuant to the Company's equity incentive plan, which was approved in connection with the Merger.  Defendant Larsen will not vote to initiate litigation over the Merger that resulted in him receiving over $1.1 million in compensation.  Nor will he vote to challenge the Merger which provided substantial benefits to Advent, the entity that is responsible for defendant Larsen receiving over $1 million in compensation for six months' worth of work.  Nor will he risk such future payouts by voting to initiate litigation against executives of Advent.  Indeed, as the Company's most recent Proxy Statement admits, defendant Larsen is not independent.

125.    Defendant Parisi is another one of Advent's go-to directors.  In addition to ATI, defendant Parisi served on the board of directors of Cotiviti, Inc. ("Cotiviti").  Advent owned a

controlling interest in Cotiviti at the time defendant Parisi served as a director there. In addition, defendant Parisi served as a director of Cotiviti at the same time as defendant Petrone.

126.    Defendant Burns is a professional member of boards of directors. According to her biography, defendant Burns has not been employed since 2019. Defendant Burns serves on three other boards, two nonpublic companies, and one nonprofit. Defendant Burns received $210,035 from ATI for serving on its Board. Accordingly, this amount is material to her and she will not risk it by voting to initiate litigation against the executives that control Advent nor by challenging the Merger which provided substantial benefits to Advent. In addition, as a professional board member, defendant Burns will not act against the interests of Advent, a serial investor with numerous portfolio companies, and ruin the chances of her receiving additional board positions.

127.    Defendant McKnight is interested in the Merger due to his role as a Managing Partner of Fortress.

128.    Non-defendant Vitti is the Company's CEO. Advent, as the Company's controlling stockholder, has the ability to replace Vitti at will. Vitti will not vote to initiate litigation over the Merger that created hundreds of millions of dollars in value for Advent, the entity that controls her employment.

## COUNT I

### Against the FVACII Defendants for Breach of Fiduciary Duty

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    Each FVACII Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ATI's business and affairs, particularly with respect to issues as fundamental as public disclosures.

131.    The FVACII Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The FVACII Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of ATI.

132.    In breach of their fiduciary duties owed to ATI, the FVACII Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

133.    As a direct and proximate result of the FVACII Defendants' breaches of their fiduciary obligations, ATI has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

### COUNT II

**Against the Legacy ATI Defendants and Sponsor for Aiding and Abetting
Breach of Fiduciary Duty**

134.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135.    The Legacy ATI Defendants and defendant Sponsor knowingly participated in the breaches of fiduciary duty committed by the FVACII Defendants.  The Legacy ATI Defendants and defendant Sponsor knew that Legacy ATI was expecting significant difficulties in its business, did not disclose these difficulties to the public, and the FVACII Defendants did not conduct the claimed due diligence.

### COUNT III

**Against Defendants Diab, Jordan, and McKnight for Contribution Pursuant
to Section 21D of the Exchange Act for Violation of Section 10(b)**

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.    The conduct of defendants Diab, Jordan, and McKnight, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

138.    ATI is named as a defendant in the related Securities Class Action that alleges and asserts claims arising under section 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. If ATI is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of all or some of the defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

139.    As officers, directors, and otherwise, defendants Diab, Jordan, and McKnight had the power or ability to, and did, control or influence, either directly or indirectly, ATI's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5.

140.    Defendants Diab, Jordan, and McKnight are liable under section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

141.    Defendants Diab, Jordan, and McKnight have damaged the Company and are liable to the Company for contribution.

142.    No adequate remedy at law exists for plaintiff by and on behalf of the Company.

## COUNT IV

**Against the FVACII Defendants for Violations of Section 14(a) of the Exchange Act**

143.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.    SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.  Specifically, the Company's Proxy violated section 14(a) and SEC Rule 14a-9 because it solicited stockholder approval for the business combination while failing to disclose material facts about ATI's business.

145.    In the exercise of reasonable care, the FVACII Defendants should have known that the statements contained in the Proxy were materially false and misleading.

146.    The misrepresentations and omissions in the Proxy were material to Company stockholders in voting on the Proxy.  The Proxy solicited stockholder votes for: (i) the business combination; (ii) issuance of shares; (iii) adoption of an amended and restated certificate of incorporation; (iv) governance provisions; (v) director nominees; and (vi) incentive plan.  The Proxy was an essential link in the accomplishment of the continuation of the FVACII Defendants' continued violation of their fiduciary duties.

147.    The Company was damaged as a result of the FVACII Defendants' material misrepresentations and omissions in the Proxy.

## COUNT V

### Against the Legacy ATI Defendants for Unjust Enrichment

148.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.    By their wrongful acts and omissions, the Legacy ATI Defendants were unjustly enriched at the expense of and to the detriment of ATI.

150.    Plaintiff, as a stockholder and representative of ATI, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct.

151.    Plaintiff, on behalf of ATI, has no adequate remedy at law.

## COUNT VI

### Against the Defendants for Contribution and Indemnification Under Delaware Law

152.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.    This claim is brought derivatively on behalf of the Company for contribution and indemnification against the defendants.

154.    ATI is named as a defendant in the related Securities Class Action.  If ATI is ultimately found liable for violating federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the Individual Defendants as alleged herein.

155.    Accordingly, ATI is entitled to all appropriate contribution and/or indemnification from the defendants, who are responsible for exposing ATI to liability under Delaware contribution and indemnification law.

156.    Plaintiff, on behalf of ATI, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of ATI, demands judgment as follows:

A.    Finding that a stockholder demand on the Demand Board would have been a futile and useless act and plaintiff may maintain this action on behalf of ATI and that plaintiff is an adequate representative of the Company;

B.    Finding that the defendants violated the federal securities laws, breached their fiduciary duties to the Company, aided and abetted those breaches, or were unjustly enriched;

C.    Finding against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of federal law, breaches of fiduciary duties, aiding and abetting thereof, and unjust enrichment;

D.    Directing ATI to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ATI and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to appropriately test, and then strengthen, the Company's internal operational control functions and the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

2.    a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3. a proposal to appropriately test, and then strengthen, the Company's disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and public; and

4. a provision to permit the stockholders of ATI to nominate at least three new candidates for election to the Board.

E. Finding against each of the defendants in favor of ATI for the amount of damages sustained by ATI, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

F. Awarding to ATI restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by these defendants;

G. Directing the defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that ATI's directors, officers, and employees do not engage in wrongful or illegal practices;

H. Granting appropriate equitable and/or injunctive relief to remedy the defendants' misconduct, as permitted by law;

I. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J. Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: September 20, 2022

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC

*/s/Carl Malmstrom*
CARL MALMSTROM

111 West Jackson, Suite 1700

Chicago, IL 60604
Telephone: (312) 984-0000
E-mail: malmstrom@whafh.com

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
GREGORY E. DEL GAIZO
SHANE P. SANDERS
EMILY R. BISHOP
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
        csmith@robbinsllp.com
        gdelgaizo@robbinsllp.com
        ssanders@robbinsllp.com
        ebishop@robbinsllp.com

Attorneys for Plaintiff

1584697